UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

KLEO AG,

    A stock corporation formed under the laws of the Principality of Liechtenstein, with its principal place of business at Austrasse 14, 9495 Triesen, Liechtenstein.

                                *Plaintiff,*

vs.

RIVADA NETWORKS, INC.,

    A Delaware limited liability company located at 1050 30th Street NW, Washington DC 20007,

                                *Defendant.*

Civil Action No.

1:22-cv-1664

_____

**COMPLAINT FOR DEFAMATION**
**AND TORTIOUS INTERFERENCE WITH CONTRACT**

    Plaintiff KLEO AG ("KLEO") alleges the following for its Complaint against Defendant Rivada Networks, Inc. ("Rivada US").

**PRELIMINARY STATEMENT**

    Plaintiff KLEO is a European company that provides customers with access to a satellite-based global data network. This case is about Plaintiff's competitor, Rivada US, making false, defamatory and xenophobic (anti-Asian) statements to the media through its Chairman and CEO, Declan J. Ganley ("Ganley"), to interfere with KLEO's business. The

offending statements were made strategically on the second day of an important four-day global satellite conference that takes place annually in this District.  The conference is widely attended and monitored by those individuals and entities engaged in the satellite community.

The purpose and result of Defendant's defamatory statements—made during a podcast interview in the District of Columbia on March 22, 2022—was to discredit KLEO among its industry peers who were attending the conference in the District, and to interfere with Plaintiff's KLEO's contractual rights to a radio spectrum frequency license critical to KLEO's operations. Rivada US made these false and defamatory statements intentionally and maliciously to discredit KLEO and its shareholders, and to help Rivada US's own private commercial efforts to usurp KLEO's radio-spectrum frequency license for itself in support of its own satellite-based global data network.  In the alternative, Rivada US made these statements negligently.  KLEO was damaged and suffered injury as a result.

## **PARTIES**

## I.    **PLAINTIFF KLEO**

1.    Plaintiff KLEO is a Liechtenstein corporation with its principal place of business in Triesen, Liechtenstein.  It is a wholly-owned subsidiary of KLEO Connect GmbH ("KLEO GmbH"), a limited liability company formed under the laws of Germany, with its principal place of business in Berlin, Germany.  The satellite constellation that Plaintiff and its parent company are building is colloquially and widely known in the satellite industry as "KLEO Connect."

2.    KLEO and its parent company, KLEO GmbH are both private companies, formed and having their principal places of business in Europe.

3.    KLEO Connect is a low-earth orbit global data network that balances the use of

leading-edge and heritage technologies to provide reliable and low-cost solutions and

infrastructure for global data transfer. One of its core aims is to drive digitalization and

business transformation from space within the global Industrial Internet of Things (IIoT)

market.[1]  The backbone of KLEO Connect is a constellation of low-earth-orbit (LEO) satellites.

## II.      DEFENDANT RIVADA US

4.      Rivada US  is a private Delaware corporation formed on March 1, 2007.  Upon

information and belief, Rivada US's principal place of business is 1050 30th Street NW,

Washington DC 20007.  It describes itself as a communications technology business founded by

Ganley.[2]

## SIGNIFICANT  NON-PARTIES

5.      The Office of Communication of Liechtenstein ("Liechtenstein Office of

Communication") is a regulatory, supervisory and administrative authority for the Principality

of Liechtenstein.[3]  Among its duties and responsibilities, is the management of radio

frequencies used by satellites.

6.      The International Telecommunications Union ("ITU") is the United Nations'

specialized agency for information and communication technologies.[4]  Among its

responsibilities is the allocation of coordinated radio frequencies and satellite orbits.

7.      TRION AG ("TRION") is a corporation established under the laws of the

Principality of Liechtenstein.  Its principal place of business is in Vaduz, Liechtenstein.

---

[1] https://kleo-connect.com/constellation (last visited June 3, 2022).
[2] https://www.rivada.com/team-members/declan-j-ganley/ (last visited June 3, 2022).
[3] https://www.llv.li/inhalt/1833/amtsstellen/english-information (last visited on June 3, 2022).
[4] https://www.itu.int/en/about/Pages/default.aspx (last visited on June 3, 2022).

8.     Rivada Space Networks GmbH ("Rivada GmbH"), upon information and belief, is a limited liability company recently formed under the laws of Germany.  Upon information and belief, it is owned and controlled by Rivada US and/or Ganley.


## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because this action is between a foreign corporation and a citizen of Delaware and Washington, DC, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

10.     This Court has general personal jurisdiction over Rivada US because it is a citizen of the District of Columbia.

11.     This Court has specific personal jurisdiction over Rivada US because the false, defamatory and xenophobic statements herein at issue were made by Ganley in the District of Columbia and caused injury in this District.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.


## FACTUAL BACKGROUND

**I.     The Role of the ITU in Satellite-Based Telecommunications Networks.**

13.     The prevalent way for satellites to communicate with receivers on Earth (either stationary or mobile) is through radio waves.

14.     Radio frequencies used by satellites are a limited and valuable resource that is regulated by the ITU, an agency of the United Nations that controls radio frequency registrations. The ITU operates on a "first to file" basis. This means that the first filer to

4

reserve a range of frequencies has priority over later filers and a claim on their orbital

configuration of altitudes, angles of incline, and orbital real estate.  Later filers must operate

their system without interfering with the frequency rights or orbits of more senior—*i.e.*,

prior—filers.

15.    Satellite operators must launch and maintain a satellite transmitting in the

relevant radio frequency for a certain amount of time after the ITU grants frequency rights.

These initial satellites are known as "bring-into-use" or "BIU" satellites.

16.    Getting BIU satellites launched and into orbit is a costly and time-sensitive

exercise, with a single satellite costing upwards of tens of millions of dollars to design, build,

launch and operate.

## II.    KLEO  Licenses the Use of the Frequencies and Puts the BIU Satellites into Orbit.

17.    On or about January 8, 2018, the Liechtenstein Office of Communication and

TRION concluded an agreement granting TRION the right to use certain radio frequencies (the

"Frequency Allocation" or "Frequency Allocation Order").  Pursuant to a Frequency Usage

Agreement entered on September 22, 2017, the use of these rights was transferred exclusively

to KLEO.

18.    The Frequency Usage Agreement that KLEO and TRION entered on

September 22, 2017 is based on the Frequency Allocation Order by the Liechtenstein Office of

Communications to TRION for the development of a non-geostationary, low-earth-orbit

("LEO") satellite project. All rights to use the frequencies were exclusively licensed to KLEO

under the Frequency Usage Agreement.

19.    Under ITU regulations, there is a process called "Request for Coordination" in

which more junior—*i.e.*, later—filers ensure there will be no radio frequency interference with

5

senior filers.  This is referred to as the Request for Coordination or "RFC" process.

20.     The Frequency Allocation Order gave TRION—and by assignment KLEO—permission to carry out the RFC process at its own expense.

21.     The Liechtenstein Office of Communications approved the transfer of the rights of use to all frequencies covered by the Frequency Allocation explicitly and exclusively to KLEO for the entire duration of the allocation.

22.     For the purpose of the BIU requirements, two satellites were successfully launched on November 17, 2019. After reaching their orbits, the satellites were successfully operated for more than 90 days, thus fulfilling the ITU requirements for the BIU.

23.     The confirmation of the BIU, *i.e.* the successful commencement of use of the frequencies, is made by the national regulatory authority of a member state of the ITU; in this case the Liechtenstein Office of Communications.

24.     The Liechtenstein Office of Communication declared the BIU requirement satisfied for both relevant frequencies on June 1, 2021.


**III.   Rivada US Launches an Unlawful Plan to Gain Control of the Frequency Allocation.**

25.     Rivada US is no stranger to headlines concerning its reported failed bids under questionable circumstances in the telecommunications industry.  For example, Rivada US was reported to have lost a potential $7 billion contract to control emergency spectrum across large parts of the US, and a "substantial state contract in Mexico … in controversial circumstances."

It also was reported to have been connected to a failed no-bid contract being promoted by the Trump Administration, although Rivada US has denied involvement.[5]

26.     Rivada US has sought to reinvent itself as a "disruptive new company set to establish and operate the first truly global low latency point-to-point connectivity network of LEO satellites"[6]  In doing so, it took aim at KLEO and the valuable Frequency Allocation it had licensed from TRION pursuant to the Frequency Usage Agreement.

27.     In the second half of 2021, Rivada US launched a plan to take control of the board of TRION by secretly purchasing the ownership interest of one of TRION's members (Celeste Holding AG), a Liechtenstein entity, and then attempting to install its own loyalist board.

28.     At or about the same time, Rivada US mimicked the KLEO corporate structure and formed a Liechtenstein entity named Rivada AG, and a German entity named Rivada Space Networks GmbH.

29.     On March 2, 2022, the putative TRION board that Rivada US attempted to install declared to KLEO the purported termination of the Frequency Usage Agreement for cause.

30.      Both Rivada US's attempted takeover of TRION's decision-making authority and the purported termination of the Frequency Usage Agreement are disputed by KLEO, KLEO GmbH and its majority shareholders. This has been and probably will be the subject of multiple pieces of arbitration and litigation in Germany and Liechtenstein. As part of this litigation, KLEO GmbH, on May 30, 2022, obtained  injunctive relief against TRION by the

---

[5] https://www.independent.ie/business/technology/businessman-declan-ganley-denies-us-report-of-no-bid-contract-push-39649918.html (last visited June 3, 2022).
[6] https://www.prnewswire.com/news-releases/rivada-space-networks-joins-itu-partner2connect-digital-coalition-to-foster-meaningful-connectivity-and-digital-transformation-globally-301545683.html (last visited June 3, 2022).

Princely District Court of Liechtenstein ordering the removal of the TRION board members Declan Ganley, Diederik Kelder and Michael Prinz von und zu Liechtenstein (all of whom were improperly appointed by Rivada US) and the reinstallation of the TRION board member originally appointed by KLEO GmbH.

31.     Because of the close-knit nature of the satellite industry, the ongoing arbitration and litigation are monitored by the relevant media, investor and operator communities, including those who attended the March 22-24 SATELLITE Convention in Washington, DC.

32.     Defendant Rivada US is acutely aware of the importance and presence of the media and relevant investor, regulator and operator communities participating directly or remotely in the SATELLITE Convention.  Furthermore, the Defendant is well aware of the importance of the media and its influence in the close-knit satellite communications industry and frequently and systematically participates in providing press releases and interviews.

## THE DEFAMATORY STATEMENT BY RIVADA US

33.     The SATELLITE Convention, which is held annually in Washington, DC, describes itself as "universally recognized as the world's most critical and inclusive social gathering of space and satellite thought leaders. Executives, engineers, government officials, and commercial customers convene at SATELLITE to solve global challenges, bridge the digital divide, increase access to space, cultivate new innovation and future leadership, collaborate on policy, and network with colleagues and peers."[7]  "SATELLITE has a history of being the largest business gathering, innovation platform, and media event of the year [in the satellite

---

[7] https://2022.satshow.com/why-attend/ (last visited on June 3, 2022).

industry].”[8]

34.     On March 22, 2022, the Defendant defamed KLEO during an internet podcast given by its CEO, Ganley, in Washington, DC (the "Defamatory Publication"), on the second day of the four-day SATELLITE Convention.[9]

35.     The Defamatory Publication was distributed publicly and globally through the Internet via the news service Spacewatch Europe, a well-known and authoritative source for news within the close-knit satellite-communications industry.

36.     The most immediate impacts of the Defamatory Publication were felt in Washington, DC, where many of the world's influential leaders in the satellite community were gathered for the SATELLITE Convention.

37.     During the Defamatory Publication, in response to a question by the interviewer about litigation in Germany and Liechtenstein concerning KLEO and its affiliates and contract partners, Defendant, through its CEO Ganley, made the following statements:

> So what you're talking about to folks that wouldn't be familiar, is a company in Germany called KLEO Connect that had been developing a business plan to deploy in this space. The company that actually holds the frequency licenses is a company called TRION which is in Liechtenstein. It's not KLEO Connect. So KLEO Connect only ever had a provisional and subjective [license] subject to a lot of different bases on which it was making these plans.

> There were a group of Chinese government-backed shareholders that were in that company. I won't get into the details of this, but it wouldn't strike your listeners as being particularly surprising given other things that you read about what goes on with China, but let's just say that there was absolutely no way in the world that this plan of theirs was credible or was capable of being executed upon, and furthermore, there are some very strict rules with regard to moving, or de facto moving, [a license for] constellation rights from one place to another.

> This is a European constellation. These are European filings and it was pretty obvious, not just obvious, but actually categorically stated that the plan was to move

---

[8] https://2022.satshow.com/about-us/ (last visited on June 3, 2022).
[9] https://spacewatch.global/2022/04/space-cafe-radio-with-declan-ganley-of-rivada-space-networks/ (last visited on June 3, 2022).

these to China, and while there would've been, if you like, a sort of front organization left remaining in Germany, everything else would've been moved and that was not something that the minority shareholder in KLEO Connect that had very clear rights was going to allow the European shareholder so we stepped in and, frankly, saved the project.

So, the licenses are no longer provisionally being used or allowed to be used by KLEO Connect. That's finished. That's been terminated. That's done, so KLEO Connect no longer has the use of those licenses. Those licenses have been removed and so, if you like, it has been amputated from the filings. Now what happens to it, frankly, is up to the shareholders. That is a matter of litigation and I'll say here and I've said elsewhere, you know, I expect, I won't be surprised if that's litigation that goes on for years and years and if that's what the Chinese shareholders want to do then they can knock themselves out as far as I'm concerned.

I'll be happy to engage in that but that has been cut off and cast away and if they want to carry on litigating in there for years they're welcome to do so. But it has got nothing to do any longer with the filings and the entity that is now executing on this project is Rivada Space Networks GmbH in Germany. That is the operating company. Rivada Space Networks is deploying the constellation, it is going to be operating the system and the ownership of Rivada Space Networks has zero Chinese ownership, influence or involvement and is completely separate and comes under Rivada Network, so, this is now a European project with European filings with European management team involving Americans as well and people from elsewhere around the world to execute on what will be a global constellation which is going to be very disruptive in redefining this space but the KLEO Connect history has been detached from this, and, as I say, yeah, and by the way I should also say that an offer was made to the Chinese shareholders to redeem them so, you know, they don't need to, there was no way for them to execute on this anyway.

38.    Through the Defamatory Publication, Defendant made, endorsed, and adopted the following six false and defamatory statements ("False Allegations") excerpted from the text quoted above (italics added):

  i.  **False Statement #1**: *"These are European filings and it was pretty obvious, not just obvious, but actually categorically stated that the plan was to move these to China … ."*

This statement was demonstrably false when made. Neither KLEO nor any person acting on behalf of KLEO has ever made such a statement. Defendant made this statement knowing that it was false and, together with False Statements #3 and #4, with the intent to stoke xenophobic (anti-Chinese) fears and thereby cause damage to KLEO's reputation. In the alternative, the

Defendant should have known this statement was false.

      ii.  **False Statement #2**: "*The company that actually holds the frequency licenses is a company called TRION, which is in Liechtenstein.  It's not KLEO Connect.  So KLEO Connect only ever had a provisional and subjective [license] subject to a lot of different bases on which it was making these plans.*"

This statement was demonstrably false or, alternatively, false by implication.  It falsely suggests that TRION has not just the license, but that TRION, and not KLEO Connect, has the right to actually use the frequency to commercialize the KLEO Connect project.  Although TRION was granted the Frequency Allocation from the Liechtenstein Office of Communication, in the Frequency Usage Agreement, TRION transferred all relevant rights of use of the Frequency Allocation to KLEO. In other words, all rights in the use of the allocated frequencies lie *exclusively* with KLEO on the basis of the Frequency Usage Agreement, and it is therefore false to say that KLEO has only "a provisional and subjective [license] subject to a lot of different bases."  This concerns both the technical development of the satellite project, *and* any subsequent commercial use and the international coordination—which is central to the Frequency Allocation. Due to its contractual obligations, TRION *could not have* commercialized the project itself, because these rights lie with KLEO. TRION's only purpose is to receive and manage frequency allocations, but not itself to undertake any operational project development. Central to this is the following provision of clause 6 of the Frequency Usage Agreement:

> Upon allocation of the frequency usage rights by the competent regulatory authority, TRION SPACE AG shall grant KLEO AG the exclusive right to use all frequencies covered by the allocation for the entire period of the allocation, including any extensions to be obtained, for the operation of the satellite system planned by KLEO AG in accordance with Annex 3 and for the provision of satellite services.

The Frequency Usage Agreement is the basis of the Frequency Allocation Order. No entity

other than KLEO could use the Frequency Allocation without an amendment of the Frequency Allocation Order. In lieu of such amendment, the implementation of international coordination (RFC), and thus the use of the frequencies, is not possible.  Defendant knew that False Statement #2 was false at the time it was made because Defendant had access to, and, on information and belief, either actually reviewed or was willfully blind in failing to review, both the Frequency Allocation Order and the Frequency Usage Agreement.  In the alternative, the Defendant should have known this statement was false.  The False Statement was harmful to KLEO because it discredited it in the eyes of the satellite community by giving the false impression that KLEO's rights to commercialize the relevant frequencies were more attenuated or uncertain than they actually were.

iii. **False Statement #3**: "*I should also say that an offer was made to the Chinese shareholders to redeem them.*"

This statement, at best, is misleading because it implies that a lawful or commercially reasonable offer was made to the "Chinese" shareholders, when Defendant knew that was untrue (or, in the alternative, was negligent in making this statement).  In fact, no lawful or commercially reasonable offer was ever made to the "Chinese" shareholders to redeem them. The minority shareholders of KLEO GmbH: eightyLEO Holding GmbH and Rivada US-backed Celeste Holding AG, tried to circumvent the agreements between the shareholders and to "redeem" the "Chinese" shareholders at nonsensical values—a single digit fraction of what should have been offered to them—which required them to initiate legal proceedings to protect their financial interests.   Because Ganley is the CEO of Rivada US, and had access, through its investment vehicles, to the books and records of TRION and KLEO Connect GmbH—and, on information and belief, either actually reviewed these books and records or was willfully blind in failing to do so—Ganley knew that these redemption offers were not lawful or commercially

reasonable.  This False Statement harmed KLEO because it falsely implied that the "Chinese"

shareholders' interests in KLEO AG were interests that Rivada US or others under its control

had sufficient resources to purchase or "redeem", and sufficient resources to continue the

development of the contemplated KLEO Connect constellation in the absence of the "Chinese"

shareholders, when in fact they lacked those resources.

> iv. **False Statement #4**: "*There were a group of Chinese government-backed
> shareholders that were in that company.  I won't get into the details of this,
> but it wouldn't strike your listeners as being particularly surprising given
> other things that you read about what goes on with China, but let's just say
> that there was absolutely no way in the world that this plan of theirs was
> credible or was capable of being executed upon, and furthermore, there are
> some very strict rules with regard to moving, or de facto moving, [a license
> for] constellation rights from one place to another.*"

This statement is actually false or, alternatively, implicitly based on facts that are actually false.

The successful status of the KLEO Connect project to date and the assurances provided by its

investors to ensure its continued success are well known to the Defendant.  Until the purported

(unlawful) termination of the Frequency Usage Agreement, the KLEO Connect project was

proceeding successfully and on pace.  The investors had already invested EUR 120 million and

committed to securing the full financing of the project.  Two Alpha satellites were launched in

November 2019, and the "bring-into-use" of the frequencies was declared by Liechtenstein on

June 1, 2021.  The investors confirmed that the satellites required to meet the ITU Milestone 1

also would timely launch, and the international coordination of frequencies under the RFC

process was proceeding apace.  The Defendant knew False Statement #4 was false, because all

of these facts were known to Defendant at the time False Statement #4 was made, yet False

Statement #4 implies that none of these milestones had been achieved and none of the elements

of continued success were in place.  In the alternative, the Defendant should have known this

statement was false.

Furthermore, False Statement #4 relies upon False Statement #1 in implying that it was the Plaintiff's stated intention to move the Frequency Allocation to another jurisdiction (i.e., China). As set forth in paragraph 38(i) above, Defendant knew Statement #1 to be false, or, alternatively, should have known it to be false.

> v. **False Statement #5**: *"So, the licenses are no longer provisionally being used or allowed to be used by KLEO Connect. That's finished. That's been terminated. That's done so KLEO Connect no longer has the use of those licenses. Those licenses have been removed and so, if you like, it has been amputated from the filings."*

This statement is actually false or, alternatively, implies facts that are actually false because it implies that the licenses have been finally and definitively terminated. That is false because the putative termination of these licenses is in fact the subject of active litigation. The Frequency Allocation exclusively allocates the frequencies to TRION with the right to assign that allocation to KLEO. The purported termination of the Frequency Usage Agreement is based on the unlawful attempts by Rivada US to eliminate the rightful managers of TRION and instead falsely install its own managers who purported to terminate the Frequency Usage Agreement. The injunctive relief granted by the Princely District Court of Liechtenstein against these unlawful attempts with regard to the TRION board indicates that this termination—which was initiated by the TRION board members Declan Ganley, Diederik Kelder and Michael Prinz von und zu Liechtenstein, illegally appointed by Rivada US—was unlawful and that the Frequency Usage Agreement between TRION and KLEO must therefore be fully reinstated. The Defendant knew this statement was false or, in the alternative, should have known this statement was false.

14

vi. **False Statement #6**: "*But [KLEO] has got nothing to do any longer with the filings and the entity that is now executing on this project is Rivada Space Networks GmbH in Germany.  That is the operating company*."

This statement is false.  Rivada Space Networks GmbH has no right to the frequencies allocated to TRION and the KLEO Connect project. Without a right to the frequencies, Rivada GmbH cannot execute the project and cannot act as the operating company for the project. A new frequency usage agreement between TRION and Rivada GmbH would require an amendment of the Frequency Allocation and would be in violation of the Frequency Usage Agreement. No such amendment has been executed, and as the CEO of Rivada US, Ganley knew this.  The Defendant knew that this statement was false, or, in the alternative, Defendant should have known this statement was false.

39.    On or about May 20, 2022, after the False Allegations were published, and upon information and belief influenced by the Defamatory Publication and the False Allegations, the Liechtenstein Office of Communication approved the transfer of the relevant spectrum frequency rights from TRION to Rivada AG and Rivada GmbH, thus harming KLEO.

40.    The Defamatory Publication contains multiple False Allegations, each of which is false and defamatory on its own and collectively.

### CAUSES OF ACTION

**Count I**
**(Defamation)**

41.    KLEO re-alleges and incorporates by reference paragraphs 1 through 40 as if fully set forth herein.

42.    The Defamatory Publication and False Allegations were made orally and by way

15

of electronic and social media, including audio recordings that were aired on podcast, and the internet.  Upon information and belief, Rivada US intentionally distributed its False Allegations widely, cross-promoted the Defamatory Publication through its other media channels and re-published the material to third parties.

43.     The False Allegations concern KLEO, and the audience reasonably understood the False Allegations to concern KLEO.

44.     The False Allegations in the Defamatory Publication are defamatory *per se* because they accuse KLEO of fraud and deception and expose KLEO to public hatred, contempt, ridicule, and disgrace.

45.     Alternatively, the False Allegations in the Defamatory Publication were defamatory *per quod* because they cast doubt in the closely-knit satellite industry (which includes investors, regulators, customers, satellite operators, and satellite-network service providers) over the KLEO Connect constellation and its commercial viability.

46.     The Defendant published each of the False Allegations without privilege.

47.     The False Allegations are false.

48.     The Defendant knowingly, intentionally, and maliciously made false and defamatory statements concerning KLEO, or made these statements with reckless disregard of whether they were false or not.

49.     The Defendant published each of the False Allegations with actual knowledge that the statement was false or with reckless disregard of whether it was false or not.  As a result, KLEO is entitled to punitive damages.

50.     In the alternative, the Defendant should have known these statements were false.

16

51.     The Defendant has injured KLEO's reputation by publishing the False Allegations, and exposed KLEO to public hatred, contempt, ridicule, and disgrace.  The False Allegations induced a negative opinion of KLEO in the minds of reasonable persons, including without limitation regulators, investors and customers.

52.     As a direct and proximate result of Defendant's misconduct, KLEO has suffered and will continue to suffer economic damage.  KLEO is entitled to compensatory, special, and punitive damages in an amount to be proven at trial.

53.     Defendant has failed to issue a retraction or take any action to ensure that KLEO does not suffer further damage.

## Count II

### (Tortious Interference with Contract)

54.     KLEO re-alleges and incorporates by reference paragraphs 1 through 53, as if fully set forth herein.

55.     The September 22, 2017 Frequency Usage Agreement between TRION and KLEO is a valid and binding contract, pursuant to which KLEO and its shareholders and affiliates invested in excess of EUR 120 million to fund the development and launch of two BIU satellites and the development of the KLEO Connect constellation of satellites.

56.     Defendant was aware of the Frequency Usage Agreement and its terms.

57.     Defendant intentionally and without justification interfered with KLEO's rights under the Frequency Usage Agreement by claiming in the False Allegations that TRION had no further obligations to KLEO under the Frequency Usage Agreement.

58.     The Frequency Usage Agreement assigns TRION's usage rights in the Frequency Allocation to KLEO.

17

59.     Defendant was aware of the Frequency Allocation and its terms.

60.     Defendant intentionally and without justification interfered with KLEO's assignment of the Frequency Allocation by attempting to induce the Liechtenstein Office of Communication to amend the Frequency Allocation to permit the assignment of the Frequency Allocation from TRION to Rivada GmbH, in place of KLEO.

61.     KLEO was damaged by Defendant's tortious interference with the Frequency Usage Agreement.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff KLEO respectfully requests this Court to enter judgment in its favor and against Defendant Rivada US, and issue an Order:

1) Granting injunctive relief, including but not limited to, ordering Defendant to publicly retract and cease publication of the False Allegations;

2) awarding compensatory damages in an amount to be proven at trial;

3) awarding punitive, special, and/or exemplary damages against Defendant in an amount to be proven at trial, sufficient to prevent Defendant from continuing its willful, wanton, intentional and malicious conduct;

4) awarding pre- and post- judgment interest;

5) assessing costs and fees, including but not limited to reasonable attorneys' fees and expenses incurred in the prosecution of this action; and

6) granting such other and further relief as this Court may deem just and proper.

June 9, 2022                                             Respectfully submitted,

                                                        By: */s/ Torsten M. Kracht*

                                                        HUNTON ANDREWS KURTH LLP
                                                        Torsten M. Kracht (DC Bar No. 501905)
                                                        2200 Pennsylvania Ave NW
                                                        Washington, DC 20037
                                                        Tel: (202) 419-2149
                                                        tkracht@hunton.com

                                                        HUNTON ANDREWS KURTH LLP
                                                        David Parker (DC Bar No. 1030202)
                                                        951 E Byrd St
                                                        Richmond, VA 23219
                                                        Tel: (804) 788-8718
                                                        dparker@huntonak.com