**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| KLEO AG,<br><br>A stock corporation formed under the laws of the Principality of Liechtenstein, with its principal place of business at Austrasse 14, 9495 Triesen, Liechtenstein.<br><br>*Plaintiff,*<br><br>vs.<br><br>RIVADA NETWORKS, INC.,<br><br>A Delaware limited liability company located at 1050 30th Street NW, Washington DC 20007,<br><br>*Defendant.* | Civil Action No.<br>22-cv-01664 (DLF) |

**SECOND AMENDED COMPLAINT FOR DEFAMATION**

Plaintiff KLEO AG ("KLEO") alleges the following for its Complaint against Defendant Rivada Networks, Inc. ("Rivada US").

**PRELIMINARY STATEMENT**

Plaintiff KLEO is a European company that provides customers with access to a satellite-based global data network. This case is about Plaintiff's competitor, Rivada US, making false, defamatory and xenophobic (anti-Asian) statements to the media through its Chairman and CEO, Declan J. Ganley ("Ganley"), to interfere with KLEO's business. The offending statements were made strategically on the second day of an important four-day

global satellite conference that takes place annually in this District. The conference is widely attended and monitored by those individuals and entities engaged in the satellite community.

The purpose and result of Defendant's defamatory statements—made during a podcast interview in the District of Columbia on March 22, 2022—was to discredit KLEO among its industry peers who were attending the conference in the District. Rivada US made these false and defamatory statements intentionally and maliciously to discredit KLEO and its shareholders, and to help Rivada US's own private commercial efforts to usurp KLEO's radio-spectrum frequency license for itself in support of its own satellite-based global data network. In the alternative, Rivada US made these statements negligently. KLEO was damaged and suffered injury as a result.

## PARTIES

### I. PLAINTIFF KLEO

1. Plaintiff KLEO is a Liechtenstein corporation with its principal place of business in Triesen, Liechtenstein. It is a wholly-owned subsidiary of KLEO Connect GmbH ("KLEO GmbH"), a limited liability company formed under the laws of Germany, with its principal place of business in Berlin, Germany. The satellite constellation that Plaintiff and its parent company are building is colloquially and widely known in the satellite industry as "KLEO Connect."

2. KLEO and its parent company, KLEO GmbH are both private companies, formed and having their principal places of business in Europe.

3. KLEO Connect is a low-earth orbit global data network that balances the use of leading-edge and heritage technologies to provide reliable and low-cost solutions and infrastructure for global data transfer. One of its core aims is to drive digitalization and

business transformation from space within the global Industrial Internet of Things (IIoT) market.[1] The backbone of KLEO Connect is a planned constellation of low-earth-orbit (LEO) satellites.

## II. DEFENDANT RIVADA US

4. Rivada US is a private Delaware corporation formed on March 1, 2007. Upon information and belief, Rivada US's principal place of business is 1050 30th Street NW, Washington DC 20007. It describes itself as a communications technology business founded by Ganley.[2]

## SIGNIFICANT NON-PARTIES

5. The Office of Communication of Liechtenstein ("Liechtenstein Office of Communication") is a regulatory, supervisory and administrative authority for the Principality of Liechtenstein. Among its duties and responsibilities, is the management of radio frequencies used by satellites.

6. The International Telecommunications Union ("ITU") is the United Nations' specialized agency for information and communication technologies.[3] Among its responsibilities is the allocation of coordinated radio frequencies and satellite orbits.

7. TRION AG ("TRION") is a corporation established under the laws of the Principality of Liechtenstein. Its principal place of business is in Vaduz, Liechtenstein.

---

[1] https://kleo-connect.com/constellation (last visited April 13, 2023).
[2] https://www.rivada.com/team-members/declan-j-ganley/ (last visited April 13, 2023).
[3] https://www.itu.int/en/about/Pages/default.aspx (last visited April 13, 2023).

8. Rivada Space Networks GmbH ("Rivada GmbH"), upon information and belief, is a limited liability company recently formed under the laws of Germany. Upon information and belief, it is owned and controlled by Rivada US and/or Ganley.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because this action is between a foreign corporation and a citizen of Delaware and Washington, DC, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

10. This Court has general personal jurisdiction over Rivada US because it is a citizen of the District of Columbia.

11. This Court has specific personal jurisdiction over Rivada US because the false, defamatory and xenophobic statements herein at issue were made by Ganley in the District of Columbia and caused injury in this District.

12. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTUAL BACKGROUND

### I. The Role of the ITU in Satellite-Based Telecommunications Networks.

13. The prevalent way for satellites to communicate with receivers on Earth (either stationary or mobile) is through radio waves.

14. Radio frequencies used by satellites are a limited and valuable resource that is regulated by the ITU, an agency of the United Nations that controls radio frequency registrations. The ITU operates on a "first to file" basis. This means that the first filer to

reserve a range of frequencies has priority over later filers and a claim on their orbital configuration of altitudes, angles of incline, and orbital real estate. Later filers must operate their system without interfering with the frequency rights or orbits of more senior—*i.e.*, prior—filers.

15. Satellite operators must launch and maintain a satellite transmitting in the relevant radio frequency for a certain amount of time after the ITU grants frequency rights. These initial satellites are known as “bring-into-use” or “BIU” satellites.

16. Getting BIU satellites launched and into orbit is a costly and time-sensitive exercise, with a single satellite costing upwards of tens of millions of dollars to design, build, launch and operate.

## II. KLEO Licenses the Use of the Frequencies and Puts the BIU Satellites into Orbit.

17. On or about January 8, 2018, the Liechtenstein Office of Communication and TRION granted TRION the right to use certain radio frequencies (the “Frequency Allocation” or “Frequency Allocation Order”). Pursuant to a Frequency Usage Agreement entered on September 22, 2017, the use of these rights was transferred exclusively to KLEO.

18. The Frequency Usage Agreement that KLEO and TRION entered on September 22, 2017 is based on the Frequency Allocation Order by the Liechtenstein Office of Communications to TRION for the development of a non-geostationary, low-earth-orbit (“LEO”) satellite project. All rights to use the frequencies were exclusively licensed to KLEO under the Frequency Usage Agreement.

19. Under ITU regulations, there is a process called “Request for Coordination” in which more junior—*i.e.*, later—filers ensure there will be no radio frequency interference with senior filers. This is referred to as the Request for Coordination or “RFC” process.

20. The Frequency Allocation Order gave TRION—and by assignment KLEO—permission to carry out the RFC process at its own expense.

21. The Liechtenstein Office of Communications approved the transfer of the rights of use to all frequencies covered by the Frequency Allocation explicitly and exclusively to KLEO for the entire duration of the allocation.

22. For the purpose of the BIU requirements, two satellites were successfully launched on November 17, 2019. After reaching their orbits, the satellites were successfully operated for more than 90 days, thus fulfilling the ITU requirements for the BIU.

23. The confirmation of the BIU, *i.e.* the successful commencement of use of the frequencies, is made by the national regulatory authority of a member state of the ITU; in this case the Liechtenstein Office of Communications.

24. The Liechtenstein Office of Communication declared the BIU requirement satisfied for both relevant frequencies on June 1, 2021.

## III. Rivada US Launches an Unlawful Plan to Gain Control of the Frequency Allocation.

25. Rivada US is no stranger to headlines concerning its reported failed bids under questionable circumstances in the telecommunications industry. For example, Rivada US was reported to have lost a potential $7 billion contract to control emergency spectrum across large parts of the US, and a "substantial state contract in Mexico … in controversial circumstances." It also was reported to have been connected to a failed no-bid contract being promoted by the Trump Administration, although Rivada US has denied involvement.[4]

26. Rivada US has sought to reinvent itself as a "disruptive new company set to

[4] https://www.independent.ie/business/technology/businessman-declan-ganley-denies-us-report-of-no-bid-contract-push-39649918.html (last visited April 13, 2023).

establish and operate the first truly global low latency point-to-point connectivity network of LEO satellites"[5] In doing so, it took aim at KLEO and the valuable Frequency Allocation it had licensed from TRION pursuant to the Frequency Usage Agreement.

27. In the second half of 2021, Rivada US launched a plan to take control of the board of TRION by secretly purchasing the ownership interest of one of TRION's members (Celeste Holding AG), a Liechtenstein entity, and then attempting to install its own loyalist board. A company acting in concert with Rivada, eightyLEO Holding GmbH ("eightyLEO"), also attempted to appoint Rivada's directors onto the board of KLEO GmbH.

28. At or about the same time, Rivada US mimicked the KLEO corporate structure and formed a Liechtenstein entity named Rivada AG, and a German entity named Rivada Space Networks GmbH.

29. On March 2, 2022, the putative TRION board that Rivada US attempted to install declared to KLEO the purported termination of the Frequency Usage Agreement for cause.

30. Both Rivada US's attempted takeover of TRION's decision-making authority and the purported termination of the Frequency Usage Agreement are disputed by KLEO, KLEO GmbH and its majority shareholders. This has been and probably will be the subject of multiple pieces of arbitration and litigation in Germany and Liechtenstein.

31. As part of this litigation, KLEO GmbH, on May 30, 2022, obtained injunctive relief against TRION by the Princely District Court of Liechtenstein ordering the removal of the TRION board members Declan Ganley, Diederik Kelder and Michael Prinz von und zu Liechtenstein (all of whom were improperly appointed by Rivada US) and the reinstallation of

[5] https://www.prnewswire.com/news-releases/rivada-space-networks-joins-itu-partner2connect-digital-coalition-to-foster-meaningful-connectivity-and-digital-transformation-globally-301545683.html (last visited April 13, 2023).

the TRION board member originally appointed by KLEO GmbH.

32. On August 11, 2022, KLEO GmbH also obtained a preliminary injunction from the Regional Court of Munich, Germany, prohibiting Severin Meister and Dr. Kaiser Clemens (both of whom eightyLEO attempted to appoint to the board of KLEO GmbH) from taking various actions in the name of KLEO GmbH. That decision was affirmed on October 26, 2022. Similarly, on October 28, 2022, an appellate court in Berlin, Germany, issued an order prohibiting Severin Meister from acting as managing director on behalf of KLEO GmbH.

33. KLEO GmbH received another favorable ruling in a separate proceeding in the Regional Court of Munich on October 26, 2022, when the court set aside a preliminary injunction it had previously granted to eightyLEO ordering KLEO GmbH to preliminarily treat Severin Meister and Dr. Kaiser Clemens as managing directors of KLEO GmbH. In reversing its prior ruling, the court recognized that there was good cause for removal of these directors, who had clearly violated their legal duties and exceeded their authority. The court also recognized the importance of KLEO GmbH's frequency rights, explaining that these rights were an essential basis for the KLEO project, and that the withdrawal of these rights would "destroy the existence" of KLEO GmbH.

34. Because of the close-knit nature of the satellite industry, the ongoing arbitration and litigation are monitored by the relevant media, investor and operator communities, including those who attended the March 22-24 SATELLITE Convention in Washington, DC.

35. Defendant Rivada US is acutely aware of the importance and presence of the media and relevant investor, regulator and operator communities participating directly or remotely in the SATELLITE Convention. Furthermore, the Defendant is well aware of the importance of the media and its influence in the close-knit satellite communications industry

and frequently and systematically participates in providing press releases and interviews.

**THE DEFAMATORY STATEMENTS BY RIVADA US**

36. The SATELLITE Convention, which is held annually in Washington, DC, describes itself as "universally recognized as the world's most critical and inclusive social gathering of space and satellite thought leaders. Executives, engineers, government officials, and commercial customers convene at SATELLITE to solve global challenges, bridge the digital divide, increase access to space, cultivate new innovation and future leadership, collaborate on policy, and network with colleagues and peers."[6] "SATELLITE has a history of being the largest business gathering, innovation platform, and media event of the year [in the satellite industry]."[7]

37. On March 22, 2022, the Defendant defamed KLEO during an internet podcast given by its CEO, Ganley, in Washington, DC (the "Defamatory Publication"), on the second day of the four-day SATELLITE Convention.[8]

38. The Defamatory Publication was distributed publicly and globally through the Internet via the news service Spacewatch Europe, a well-known and authoritative source for news within the close-knit satellite-communications industry.

39. The most immediate impacts of the Defamatory Publication were felt in Washington, DC, where many of the world's influential leaders in the satellite community were gathered for the SATELLITE Convention.

[6] https://2022.satshow.com/why-attend/ (last visited on April 13, 2023).
[7] https://2022.satshow.com/about-us/ (last visited on April 13, 2023).
[8] https://spacewatch.global/2022/04/space-cafe-radio-with-declan-ganley-of-rivada-space-networks/ (last visited on April 13, 2023).

40. During the Defamatory Publication, in response to a question by the interviewer about litigation in Germany and Liechtenstein concerning KLEO and its affiliates and contract partners, Defendant, through its CEO Ganley, made the following statements:

> So what you're talking about to folks that wouldn't be familiar, is a company in Germany called KLEO Connect that had been developing a business plan to deploy in this space. The company that actually holds the frequency licenses is a company called TRION which is in Liechtenstein. It's not KLEO Connect. So KLEO Connect only ever had a provisional and subjective [license] subject to a lot of different bases on which it was making these plans.
>
> There were a group of Chinese government-backed shareholders that were in that company. I won't get into the details of this, but it wouldn't strike your listeners as being particularly surprising given other things that you read about what goes on with China, but let's just say that there was absolutely no way in the world that this plan of theirs was credible or was capable of being executed upon, and furthermore, there are some very strict rules with regard to moving, or de facto moving, [a license for] constellation rights from one place to another.
>
> This is a European constellation. These are European filings and it was pretty obvious, not just obvious, but actually categorically stated that the plan was to move these to China, and while there would've been, if you like, a sort of front organization left remaining in Germany, everything else would've been moved and that was not something that the minority shareholder in KLEO Connect that had very clear rights was going to allow the European shareholder so we stepped in and, frankly, saved the project.
>
> So, the licenses are no longer provisionally being used or allowed to be used by KLEO Connect. That's finished. That's been terminated. That's done, so KLEO Connect no longer has the use of those licenses. Those licenses have been removed and so, if you like, it has been amputated from the filings. Now what happens to it, frankly, is up to the shareholders. That is a matter of litigation and I'll say here and I've said elsewhere, you know, I expect, I won't be surprised if that's litigation that goes on for years and years and if that's what the Chinese shareholders want to do then they can knock themselves out as far as I'm concerned.
>
> I'll be happy to engage in that but that has been cut off and cast away and if they want to carry on litigating in there for years they're welcome to do so. But it has got nothing to do any longer with the filings and the entity that is now executing on this project is Rivada Space Networks GmbH in Germany. That is the operating company. Rivada Space Networks is deploying the constellation, it is going to be operating the system and the ownership of Rivada Space Networks has zero Chinese ownership, influence or involvement and is completely separate and comes under Rivada Network, so, this is now a European project with European filings with European management team involving Americans as well and people from elsewhere around the world to execute on what will be a global constellation which

> is going to be very disruptive in redefining this space but the KLEO Connect history has been detached from this, and, as I say, yeah, and by the way I should also say that an offer was made to the Chinese shareholders to redeem them so, you know, they don't need to, there was no way for them to execute on this anyway.

41. Through the Defamatory Publication, Defendant made, endorsed, and adopted the following six false and defamatory statements ("False Allegations") excerpted from the text quoted above (italics added):

> i. **False Statement #1**: *"These are European filings and it was pretty obvious, not just obvious, but actually categorically stated that the plan was to move these to China … ."*

This statement was demonstrably false when made. Neither KLEO nor any person acting on behalf of KLEO has ever made such a statement. Defendant made this statement knowing that it was false and, together with False Statements #3 and #4, with the intent to stoke xenophobic (anti-Chinese) fears and thereby cause damage to KLEO's reputation. In the alternative, the Defendant should have known this statement was false.

This False Statement conveys that KLEO's "plan" was to move control of the satellite network "to China," stoking fears among investors, satellite manufacturers, and launch service providers that management of the project will be taken over by the Chinese government. This discourages these parties from investing in or contracting with KLEO, and is therefore reasonably capable of injuring KLEO in its trade. It was also false. As the Regional Court of Munich recognized in its October 26, 2022 ruling, the claim that Chinese investors were attempting to take over the project was "unsubstantiated."

> ii. **False Statement #2**: "*The company that actually holds the frequency licenses is a company called TRION, which is in Liechtenstein. It's not KLEO Connect. So KLEO Connect only ever had a provisional and subjective [license] subject to a lot of different bases on which it was making these plans."*

This statement was demonstrably false or, alternatively, false by implication. It falsely suggests that TRION has not just the license, but that TRION, and not KLEO Connect, has the

right to actually use the frequency to commercialize the KLEO Connect project. Although TRION was granted the Frequency Allocation from the Liechtenstein Office of Communication, in the Frequency Usage Agreement, TRION transferred all relevant rights of use of the Frequency Allocation to KLEO. In other words, all rights in the use of the allocated frequencies lie *exclusively* with KLEO on the basis of the Frequency Usage Agreement, and it is therefore false to say that KLEO has only "a provisional and subjective [license] subject to a lot of different bases." This concerns both the technical development of the satellite project, *and* any subsequent commercial use and the international coordination—which is central to the Frequency Allocation. Due to its contractual obligations, TRION *could not have* commercialized the project itself, because these rights lie with KLEO. TRION's only purpose is to receive and manage frequency allocations, but not itself to undertake any operational project development. Central to this is the following provision of clause 6 of the Frequency Usage Agreement:

> Upon allocation of the frequency usage rights by the competent regulatory authority, TRION SPACE AG shall grant KLEO AG the exclusive right to use all frequencies covered by the allocation for the entire period of the allocation, including any extensions to be obtained, for the operation of the satellite system planned by KLEO AG in accordance with Annex 3 and for the provision of satellite services.

The Frequency Usage Agreement is the basis of the Frequency Allocation Order. No entity other than KLEO could use the Frequency Allocation without an amendment of the Frequency Allocation Order. In lieu of such amendment, the implementation of international coordination (RFC), and thus the use of the frequencies, is not possible. Defendant knew that False Statement #2 was false at the time it was made because Defendant had access to, and, on information and belief, either actually reviewed or was willfully blind in failing to review, both the Frequency Allocation Order and the Frequency Usage Agreement. In the alternative, the

Defendant should have known this statement was false. This False Statement was harmful to KLEO because it discredited it in the eyes of the satellite community by giving the false impression that KLEO's rights to commercialize the relevant frequencies were more attenuated or uncertain than they actually were. This discourages third parties, such as investors and satellite manufacturers, from dealing with KLEO, and is therefore reasonably capable of injuring KLEO in its trade.

iii. **False Statement #3**: "*I should also say that an offer was made to the Chinese shareholders to redeem them.*"

This statement, at best, is misleading because it implies that a lawful or commercially reasonable offer was made to the "Chinese" shareholders, when Defendant knew that was untrue (or, in the alternative, was negligent in making this statement). In fact, no lawful or commercially reasonable offer was ever made to the "Chinese" shareholders to redeem them. The minority shareholders of KLEO GmbH: eightyLEO and Rivada US-backed Celeste Holding AG, tried to circumvent the agreements between the shareholders and to "redeem" the "Chinese" shareholders at nonsensical values—a single digit fraction of what should have been offered to them—which required them to initiate legal proceedings to protect their financial interests. Because Ganley is the CEO of Rivada US, and had access, through its investment vehicles, to the books and records of TRION and KLEO Connect GmbH—and, on information and belief, either actually reviewed these books and records or was willfully blind in failing to do so—Ganley knew that these redemption offers were not lawful or commercially reasonable. Yet this False Statement deliberately implies that the offer was lawful and commercially reasonable, such that these "Chinese shareholders" might actually accept it.

This False Statement harmed KLEO because it falsely implied that the "Chinese" shareholders' interests in KLEO AG were interests that Rivada US or others under its control had sufficient

resources to purchase or "redeem", and sufficient resources to continue the development of the contemplated KLEO Connect constellation in the absence of the "Chinese" shareholders, when in fact they lacked those resources. Also, in combination with False Statement #1, it conveys that KLEO's "Chinese shareholders" rejected this redemption offer in order to carry out their "plan" of moving control of the network to China. At a minimum, this statement suggest to investors and other corporate partners that these shareholders are unreasonable. Accordingly, it is reasonably capable of injuring KLEO in its trade.

> iv. **False Statement #4**: "*There were a group of Chinese government-backed shareholders that were in that company. I won't get into the details of this, but it wouldn't strike your listeners as being particularly surprising given other things that you read about what goes on with China, but let's just say that there was absolutely no way in the world that this plan of theirs was credible or was capable of being executed upon, and furthermore, there are some very strict rules with regard to moving, or de facto moving, [a license for] constellation rights from one place to another.*"

This statement is actually false or, alternatively, implicitly based on facts that are actually false. KLEO's plan *was* both "credible" and "capable of being executed upon," for a number of reasons. The successful status of the KLEO Connect project to date and the assurances provided by its investors to ensure its continued success are well known to the Defendant. Before the false statement, , the KLEO Connect project was proceeding successfully and on pace. The investors had already invested EUR 120 million and committed to securing the full financing of the project. Two Alpha satellites were launched in November 2019, and the "bring-into-use" of the frequencies was declared by Liechtenstein on June 1, 2021. The investors confirmed that the satellites required to meet the ITU Milestone 1 also would timely launch, and the international coordination of frequencies under the RFC process was proceeding apace. The Defendant knew False Statement #4 was false, because all of these facts were known to Defendant at the time False Statement #4 was made, yet False Statement #4 implies that none of these milestones had

been achieved and none of the elements of continued success were in place. In the alternative, the Defendant should have known this statement was false.

Furthermore, False Statement #4 relies upon False Statement #1 in implying that it was the Plaintiff's stated intention to move the Frequency Allocation to another jurisdiction (i.e., China). As set forth in paragraph 38(i) above, Defendant knew Statement #1 to be false, or, alternatively, should have known it to be false.

This False Statement was harmful to KLEO because it discredited it in the eyes of the satellite community by giving the false impression that KLEO's rights to commercialize the relevant frequencies were more attenuated or uncertain than they actually were. This discourages third parties, such as investors and satellite manufacturers, from dealing with KLEO, and is therefore reasonably capable of injuring KLEO in its trade.

v. **False Statement #5**: *"So, the licenses are no longer provisionally being used or allowed to be used by KLEO Connect. That's finished. That's been terminated. That's done so KLEO Connect no longer has the use of those licenses. Those licenses have been removed and so, if you like, it has been amputated from the filings."*

This statement is actually false or, alternatively, implies facts that are actually false because it implies that the licenses have been finally and definitively terminated. That is false because the putative termination of these licenses is in fact the subject of active litigation. The Frequency Allocation exclusively allocates the frequencies to TRION with the right to assign that allocation to KLEO. The purported termination of the Frequency Usage Agreement is based on the unlawful attempts by Rivada US to eliminate the rightful managers of TRION and instead falsely install its own managers who purported to terminate the Frequency Usage Agreement. The injunctive relief granted by the Princely District Court of Liechtenstein against these unlawful attempts with regard to the TRION board indicates that this termination—which was initiated by the TRION board members Declan Ganley, Diederik Kelder and Michael Prinz von

und zu Liechtenstein, illegally appointed by Rivada US—was unlawful and that the Frequency Usage Agreement between TRION and KLEO must therefore be fully reinstated. The Defendant knew this statement was false or, in the alternative, should have known this statement was false.

This False Statement was harmful to KLEO because it discredited it in the eyes of the satellite community by giving the false impression that KLEO's rights to commercialize the relevant frequencies were more attenuated or uncertain than they actually were. This discourages third parties, such as investors and satellite manufacturers, from dealing with KLEO, and is therefore reasonably capable of injuring KLEO in its trade.

vi. **False Statement #6**: "*But [KLEO] has got nothing to do any longer with the filings and the entity that is now executing on this project is Rivada Space Networks GmbH in Germany. That is the operating company*."

This statement is false. Rivada Space Networks GmbH has no right to the frequencies allocated to TRION and the KLEO Connect project. Without a right to the frequencies, Rivada GmbH cannot execute the project and cannot act as the operating company for the project. A new frequency usage agreement between TRION and Rivada GmbH would require an amendment of the Frequency Allocation and would be in violation of the Frequency Usage Agreement. No such amendment has been executed, and as the CEO of Rivada US, Ganley knew this. The Defendant knew that this statement was false, or, in the alternative, Defendant should have known this statement was false.

This False Statement was harmful to KLEO because it discredited it in the eyes of the satellite community by giving the false impression that KLEO's rights to commercialize the relevant frequencies were more attenuated or uncertain than they actually were. This discourages third parties, such as investors and satellite manufacturers, from dealing with KLEO, and is therefore

reasonably capable of injuring KLEO in its trade.

42. These defamatory statements caused specific harm to KLEO. After these statements, many satellite manufacturers have refused to partner with KLEO and KLEO Connect GmbH in the planned satellite project. During the DC SATELLITE Conference, some of these manufacturers expressed their belief that KLEO's satellite project appeared likely to fail, or had already failed. On information and belief, the loss of these relationships was caused by Rivada's defamatory statements. Further, the loss of these relationships has caused KLEO specific pecuniary harm, because KLEO has spent time and resources attempting to repair these relationships, and also to secure partnerships with other manufacturers, including at least €4,000 in travel expenses, and more to be later proven.

43. Shortly after these defamatory statements, a well-known leading European space expert and paid contractual consultant refused to continue providing services related to KLEO's satellite project. On information and belief, the loss of this consultant was caused by Rivada's defamatory statements. Further, the loss of this consultant caused and is causing KLEO specific pecuniary harm, because (a) KLEO has spent time and resources attempting to hire a replacement consultant; and (b) KLEO had already paid the prior consultant nearly €30,000, and will ultimately need to pay more for these consulting services than would have otherwise been required, given the inefficiencies of replacing the prior consultant in the middle of the satellite project (e.g., the costs of bringing the replacement consultant up to speed, and the costs of duplicating, or at least verifying, the work done by the prior consultant). KLEO's losses include some portion of the €30,000 already paid to the prior consultant, and more to be later proven.

44. Also after the defamatory statements, many employees in the technical and regulatory team working on KLEO's satellite project left to join Rivada Space Network GmbH. On information and belief, the loss of these employees was caused by Rivada's defamatory

statements. Further, the loss of these employees caused and is causing KLEO specific pecuniary harm because (a) KLEO has spent time and resources recruiting replacement employees; and (b) KLEO will ultimately need to pay more for these new employees' services, given the inefficiencies of replacing the prior employees in the middle of the satellite project. These damages include approximately €210,000.00 in expected fees to head hunters for the replacement of KLEO's former employees, and more to be later proven.

45. On or about May 20, 2022, after the False Allegations were published, and upon information and belief influenced by the Defamatory Publication and the False Allegations, the Liechtenstein Office of Communication approved the transfer of the relevant spectrum frequency rights from TRION to Rivada AG and Rivada GmbH, thus harming KLEO. This caused specific pecuniary harm to KLEO, in an amount to be later proven, because KLEO has spent time and resources (including approximately CHF 350,000.00 in legal fees) attempting to reverse the transfer of these spectrum rights.

46. The Defamatory Publication contains multiple False Allegations, each of which is false and defamatory on its own and collectively.

## CAUSES OF ACTION

### Count I
### (Defamation)

47. KLEO re-alleges and incorporates by reference paragraphs 1 through 40 as if fully set forth herein.

48. The Defamatory Publication and False Allegations were made orally and by way of electronic and social media, including audio recordings that were aired on podcast, and the internet. Upon information and belief, Rivada US intentionally distributed its False Allegations

widely, cross-promoted the Defamatory Publication through its other media channels and re-published the material to third parties.

49. The False Allegations concern KLEO, and the audience reasonably understood the False Allegations to concern KLEO.

50. The False Allegations in the Defamatory Publication are defamatory *per se* because they accuse KLEO of fraud and deception and expose KLEO to public hatred, contempt, ridicule, and disgrace.

51. Alternatively, the False Allegations in the Defamatory Publication were defamatory *per quod* because they cast doubt in the closely-knit satellite industry (which includes investors, regulators, customers, satellite operators, and satellite-network service providers) over the KLEO Connect constellation and its commercial viability.

52. The Defendant published each of the False Allegations without privilege.

53. The False Allegations are false.

54. The Defendant knowingly, intentionally, and maliciously made false and defamatory statements concerning KLEO, or made these statements with reckless disregard of whether they were false or not.

55. The Defendant published each of the False Allegations with actual knowledge that the statement was false or with reckless disregard of whether it was false or not. As a result, KLEO is entitled to punitive damages.

56. In the alternative, the Defendant should have known these statements were false.

57. The Defendant has injured KLEO's reputation by publishing the False Allegations, and exposed KLEO to public hatred, contempt, ridicule, and disgrace. The False Allegations

induced a negative opinion of KLEO in the minds of reasonable persons, including without limitation regulators, investors and customers.

58. As a direct and proximate result of Defendant's misconduct, KLEO has suffered and will continue to suffer economic damage. KLEO is entitled to compensatory, special, and punitive damages in an amount to be proven at trial.

59. Defendant has failed to issue a retraction or take any action to ensure that KLEO does not suffer further damage.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff KLEO respectfully requests this Court to enter judgment in its favor and against Defendant Rivada US, and issue an Order:

1) Granting injunctive relief, including but not limited to, ordering Defendant to publicly retract and cease publication of the False Allegations;
2) awarding compensatory damages in an amount to be proven at trial;
3) awarding punitive, special, and/or exemplary damages against Defendant in an amount to be proven at trial, sufficient to prevent Defendant from continuing its willful, wanton, intentional and malicious conduct;
4) awarding pre- and post- judgment interest;
5) assessing costs and fees, including but not limited to reasonable attorneys' fees and expenses incurred in the prosecution of this action; and
6) granting such other and further relief as this Court may deem just and proper.

April 14, 2023

Respectfully submitted,

By: *_/s/ Torsten M. Kracht_*

HUNTON ANDREWS KURTH LLP
Torsten M. Kracht (DC Bar No. 501905)
2200 Pennsylvania Ave NW
Washington, DC 20037
Tel: (202) 419-2149
tkracht@hunton.com

HUNTON ANDREWS KURTH LLP
David M. Parker (DC Bar No. 1030202)
951 E Byrd St
Richmond, VA 23219
Tel: (804) 788-8718
dparker@huntonak.com